Mr. Bruch? Good morning, my name is Jonathan Bruch, and together with my colleague Amy Tucker, we represent the Clear Creek Independent School District. The district court erred when it failed to apply controlling jurisprudence from this court, specifically the Daniel R.R. v. State Board of Education case, to reverse the hearing officer's finding that CCISD's proposed placement of A.B. was not the least restrictive environment. Now, right there I'm going to ask, because in your reply brief you say the parties agree this court's decision in Daniel R.R. governs the substantive arguments. As a result, the dispute before this court focuses exclusively on how the facts developed. From that position, I understood your argument was that the district court made clear errors of fact, that your argument was the parties and the district court and the hearing officer all accepted D.R.R. as the controlling precedent, and your argument to us is that you're going to point to clear errors of fact. Is that correct, or is that not correct? Slight distinction, Your Honor. Here, the district court committed clear error, reversible error, by misapplying the law to the facts. And so here, the facts are largely undisputed in terms of A.B.'s capabilities, A.B.'s abilities in the classroom. The hearing officer's findings were consistent with all the witnesses' testimony that A.B. could not master any of the third grade curriculum. His curriculum was 100% modified to the kindergarten level or the first grade level. Those are fact findings that no one challenged. The district court, with those fact findings that are unchallenged by any party applying Daniel R.R., should have reached the conclusion that A.B. was not appropriately placed in the general education curriculum and that the district's proposed placement was the least restrictive environment under the circumstances presented by A.B. But he did — but the district court made the fact finding that A.B.'s situation was not one that created a burden or — or absorbed the teacher's time. Correct, Your Honor. And cited Daniel R.R. That's right, Your Honor. And in particular, cited Daniel R.R., but misapplied it. And here's how he misapplied it. Because under Daniel R.R., and I think the fact finding is clearly erroneous, is that while his — while A.B.'s behaviors improved over his time in the general education classroom, and he was not taking up all of the teacher's time, he was taking up all of the paraprofessional's time, and the paraprofessional was delivering all of the instruction to him, 100 percent of the instruction. But 1412, I mean, in order for Texas schools to get Federal money, 1412 says to the maximum extent mainstream, and mainstreaming includes giving supplemental services. So what's the law that says, well, you don't have to — you can get the Federal money, but you don't have to give a supplemental service? Correct, Your Honor. That is what the statutory law says, but the law is Daniel R.R. It's when the curriculum can be presented to the student through the supplemental services and through the specialized instruction that mainstreaming is appropriate. But here, A.B. was not receiving the third grade curriculum. He was receiving a curriculum that had been so completely modified that he was — the supplementary services were not mainstreaming him. He was sitting in a classroom receiving an entirely different set of instruction than everyone else in that classroom. You know our body of IDEA cases. Usually when the argument is that the child with a handicap or the disability can't be there, it's because there's manifest disruption in the class. Or it's deeply stressful for the student, and they began to manifest — yet it seems like a good portion of your brief and their brief was this young child was actually, thanks to you giving him the T.A., the teacher's aid, was not disrupting people. And before and after, especially after the stay-put order, did well with a different curriculum that's almost inherent in having a special aid, but covering the same elements. So it seems like your school commended this young child as doing well with a supplemental service. And, Your Honor, I think that is correct. The school district did, and the hearing officer commended the school district's efforts. They did everything they could for this young man. And yes, his behaviors, which peaked at the beginning of the third grade year, had begun to taper off. And by the second semester of the third grade year, behavior was largely not an issue in the classroom. But what is also undisputed is that he was not mastering the curriculum. The hearing officer found that while behaviors tapered off, that did not result in a corresponding increase in academic ability or a corresponding increase in academic ability to access the third grade curriculum. But I thought there was evidence in the record. I mean, little bits of evidence could be vital to assess whether it's clearly erroneous or not that another student, regular class student, said, you want to be my math partner. Yes, Your Honor, that is in the record. However, the testimony on that point goes further to say while the other student invited him in, they were not working on the same work. They were, again, in a parallel situation because A.B. couldn't access that curriculum, that math curriculum. The teacher's testimony was undisputed that he was being taught at a different level, a much lower level. So to your point earlier, yes, special education necessarily requires modification, modification of the curriculum. But what Daniel R.R. and Brillen from this court teach is when that modification becomes so significant that you're not even teaching the grade level curriculum, the student can't master the grade level curriculum and is not getting any educational benefit, then mainstreaming is not appropriate. And is not getting any educational benefit. Where's the record support? Not getting any educational benefit, and that's a very fair clarification because I spoke poorly. Not getting any educational benefit from the curriculum being presented to the general education students. A.B.'s educational benefit came from the 100% modified curriculum that was administered to him. So that's how I understand. So just to back up a second, there are four factors that the district court is supposed to consider. The factors we identified way back in Daniel R.R. and Brillen. That's correct. You seem to be talking about factor two. Am I right? Yes, Your Honor. Okay. So as I understood, at the beginning you responded to Judge Higginson and said you have no factual disputes here. We're here to talk about errors of law that in your view amount to an abuse of discretion. Amount to amount. You want to talk about errors of law. So with respect to factor two, as I understand your argument, you're saying, and correct me if I'm wrong, all the evidence says that A.B. is, the benefits that A.B. is receiving are not from the regular education curriculum, but instead from the aid. That is correct, Your Honor. And that, explain to me why is that a misapplication as a legal matter of the factor? Certainly. So with that fact, that fact you just identified, wedded to that factor, the result that Daniel R.R. dictates is that mainstreaming is not required. When none of the, no academic benefit flows from the regular education curriculum. Now, it's really not disputed that the school district took great steps to accommodate A.B. and his disability. That's factor one. The school district certainly took every available step, right down to creating a classroom within a classroom. The overall experience in mainstreaming, factor three, his experience in mainstreaming is that he was sitting in a general education classroom, but receiving an entirely different curriculum, different from the other general education students. And we talked, Judge Higginson, a little bit about the effect on the classroom during the first semester. Behaviors did create a negative effect in the classroom, which is why the initial change in placement arose around that time. But it's a misapplication of the law. When you have the evidence meeting those factors, and the undisputed fact that A.B. was getting no educational benefit from the regular education curriculum, mainstreaming is simply not required. Now, the district court- Is that why the district, I'm just asking this as just a factual question, is that why the district wanted to change from the SC to the LL? So I think, Your Honor, the record shows that the district made that proposed change in October of 2016, when it became apparent under, and it was a new placement for A.B. He was in a new, more challenging placement. His behaviors increased, and it became apparent that he wasn't accessing the general education curriculum. As his teachers testified, he didn't attend to it. He paid no attention to them. Everything came from the paraprofessional. Now the district court, confronted with those facts, under Daniel R.R., should have held as a matter of law that mainstreaming was not required. Instead, the district court supported its decision, and I think, Judge Higginson, this is what you were alluding to right at the outset, on the grounds that he made good grades on his modified curriculum. That's an undisputed fact. He did make good grades on his modified curriculum. He made progress on his IEP goals. And the district court also relied on the fact that general education curriculum would offer the opportunity for peer modeling. And I think the court pointed out the factual circumstance of the math partner. But at the same time, the district court failed to account for the fact, and I think this is an error of fact, that A.B. was proposed to remain in general education for art, recess, and lunch, the non-core classes. So he would continue to be mainstreamed to the maximum extent possible where he would have the opportunity for peer modeling. Where he would have the opportunity to interact with his non-disabled peers. And in fact, Thomas... But just back on this point, you're saying the record reflects that when the regular class student came to him about math, they were not able to work together? Yes, Your Honor. Thomas, one of A.B.'s teachers, testified that the regular education environment wasn't the ideal place for the socialization and peer interaction anyway because the class was too rigid and it moved at too quick a pace for A.B. And that that would only get worse in fourth grade as the academic pace accelerated. In fact, even A.B.'s own expert, his board certified behavior analyst, Garrow, testified that opportunities for peer modeling existed in the non-core classes. So your argument is a very narrow one. It's not that there's evidence that he harmed the regular class, nor is there evidence that being there harmed him. Nor are you saying that the principal teacher was distracted, and you acknowledge that the law says supplemental services are required and you're supposed to maximum extent mainstream. But it's just the point that if we dig into this record, we'll see that his curriculum was beyond recognition different than the main one. So he's in a bubble. That's — is that the argument? There's a fine distinction in there. That captures a great deal of the argument, yes, Your Honor. Yeah. But here's the fine distinction. A.B. remaining in the general education class for core courses would not present a risk of physical harm because the behavior had improved. And so I think with the record before us, by the end of third grade year, the evidence was that his behaviors had improved. But in the sense that he would not be in the right placement given his abilities, he would be harmed in an educational sense. But the district court's very clear to cite, unless it's clearly wrong about this, that the alternative special ed class, every student was younger than him. And when he'd been in it, he had to cover his ears because of the shrieking and the throwing. So the hearing officer and the district court are very sensitive to find out where's the best placement. Correct, Your Honor. Now, with respect to his prior placement in the — in the learning-to-learn classroom, while there is evidence that A.B. would cover his ears because of shrieking at a time, that of course was in a prior year, and it was during a year when A.B. was exhibiting the exact same behaviors that the children in that class were exhibiting. What's more — excuse me — with respect to the age of the children in the learning-to-learn class, yes, the evidence reflects that they were younger than A.B. in terms of their age. But the evidence is also clear that A.B.'s interests and educational level of attainment more closely matched younger students. There's evidence in the record that his interests, for instance, were in Thomas the Tank Engine and the Wiggles. Back on this core point you're pressing, what is the best record site overlooked by the hearing officer and the district court that his curriculum didn't cover the same elements just at a lower level, which is inherent in a challenged student, but was beyond recognition different? So what would you point to as the best evidence? So I will give you a couple, Your Honor. Okay. I think that's the best way to answer this. And interestingly, the first one is one of the hearing officer's own factual findings. And that is on page 77 of the record. It's paragraph number 37. And this is the hearing officer summarizing the facts, which, of course, were not challenged by A.B. Although student was in the third-grade classroom, his academic work was modified to the kindergarten or first-grade level. He was not expected to master any of the third-grade core curriculum. But doesn't that say it's still the same elements? It's just at a reduced level. And that's why you have a teacher's aide. I don't think it does, Your Honor. Okay. And I can give you some additional records. Yeah. Well, the best one, just because of time. Certainly. Forty-three seconds. I'll give you two. One from Christy Thomas. Go ahead. ROA 1874. Uh-huh. She testified that all of the curriculum was modified 100% to a lower level. She further testified that he didn't attend to her instruction at all. The instruction was coming from the paraprofessional, which, of course, means A.B. was not getting instruction from a teacher but from a paraprofessional. And Ms. Chodas also testified at ROA 1910 to 1911 that the curriculum was modified to kindergarten level and that it was essentially a class within a class. And that's... I mean, I think your argument is accepting that the entire construct of the statute contemplates you get money for supplemental services. So it's not that you don't need the school never needs to give a teacher's aid. It's just in this case, it was so extreme, the difference. That's a fact-finding. I couldn't find a single circuit opinion where a circuit overrules the two prior fact-finders, hearing officer, de novo review district court. Can you think of a single least restrictive means where a circuit disagrees with the assessment as to beyond recognition curriculum of both prior determinants? I cannot, Your Honor, and I think the reason why, though, is because the law is so clear in this circuit, both from Daniel R.R. and from Brillen, that when a student presents in the manner A.B. did, mainstreaming is simply not required. Now, I think one thing to consider under the standard of review, and I do see... No, please, I asked the question after the light came on. Go ahead. In the Hovum v. Kline Independent School District case, I believe Judge Jones noted that when the district court makes fact findings informed by the wrong legal standard or misapplying controlling law, the review of those findings is de novo. Right, but that's why I started my first question, is I didn't see in your briefs that you were saying... It looked to me like both sides were saying Daniel R.R. was the controlling law, everyone understood it, the issue here is a factual one. I think the issue is a misapplication of that law to the facts. Okay, great. Thank you. Mr. Whitburn. May it please the Court, Mark Whitburn for A.B. This Court has rightly pointed out that the standard of review for the underlying facts is clear error. There was no clear error by the district court, not by the hearing officer below. There was no misapplication of the law to the facts. In fact, Daniel R.R. very expressly indicates in the opinion itself that the test that it is providing is a very flexible one. There are at least four factors, I count five factors articulated by Daniel R.R., and the only one that the district met was, number one, that they did offer appropriate accommodations to my client in the general education classroom, but he received academic benefits in the general education classroom. That seems to be, Mr. Whitburn, that seems to be the core disagreement. As I understood the counsel opposite's argument, the undisputed facts here, he says, are that the educational benefits are not coming from the regular classroom. They're instead coming completely and solely from the aid, and that, therefore, that factor weighs strongly against mainstreaming. What's your response to that? I don't know if that's a factual or a legal argument, to tell you the truth, but I'd appreciate your view on it. I think there's an erroneous take on the law in the first place, and I also think that that's a factual error. So in terms of the erroneous take on the law, if the court looks at L.H. v. Hamilton School Board, which is the Sixth Circuit decision that came out in 2018, the Sixth Circuit specifically said that what the IDEA implies, the case law makes explicit, a child need not master the general education curriculum for mainstreaming to remain a viable option. Rather, the appropriate yardstick is whether the child, with appropriate supplemental aids and services, can make progress toward the IEP goals in the regular education setting. That's what the Sixth Circuit said a year ago. So the question is, that right there, if this court agrees that that is consistent with the annual R.R., that would be dispositive of this entire argument, because there's nothing there that indicates that the child has to be learning from the general education curriculum itself. Rather, can the child progress towards IEP goals in the regular education setting? Within the context of IDEA, what is the purpose of mainstreaming a child who's not, who's not, it's sort of this classroom within a classroom idea. We have the child physically in a regular classroom, but all the instruction is coming solely from a separate aid, and it's not matched whatsoever to the regular classroom. How does that fulfill IDEA's purposes? So with respect to the general idea of mainstreaming, and then I'll apply it to this specific case, with respect to the general idea of mainstreaming, there are all sorts of advantages that can come to a child who is in a regular education classroom. For example, there are all kinds of non-academic benefits that accrue. The opportunity to model typically developing peers with respect to language skills, with respect to behavioral skills. The opportunity to look at the general education curriculum, even if it is at a higher level than what that child is operating at, and learn from that, even if unable to grasp all of the concepts. Now with respect to this particular case, there's evidence that AB is not as far below the general education curriculum as CCISD would have it. So for example, in the second grade, he was in the third grade when all of these things happened, but he was in general education in the second grade as well. And in general education in the second grade, the CCISD's own staff members, the behavioral specialists for example, testified that he was able to respond to the teacher. He was grasping concepts that the general education teacher would articulate. So something changed with respect to that in the first part of his third grade. And what changed was that he had all of these behavioral issues. He had behavioral issues because of the transition, and he had behavioral issues because as the hearing officer found in Finding a Fact 36, CCISD did not implement a behavioral intervention plan that was appropriate for his circumstances in third grade. They would yank him out of the class, and then because he was exhibiting task avoidance behavior, which basically reinforced those behaviors. That interfered with his ability to learn. He was learning from his ability to get out of the class that he shouldn't participate in the class, that he should be relatively obstructionist. Once we filed a state due process proceeding and CCISD was forced to do something different as opposed to just remove him to a learning to learn classroom, he all of a sudden did much better. His behaviors decreased as CCISD's own instructional staff members testified. His ability to grasp material increased because his behaviors were interfering with his ability to learn. And so by the end of the year, he was getting to a point where he could start grasping those materials. Now, the fact that he was relying on a paraprofessional in class is not any kind of excess burden. It's not even a service that would be required to mainstream him. The evidence in the record is that the paraprofessional would be with him wherever he was. Even if he went to the learning to learn classroom, he's always got a paraprofessional with him because that's part of the issue of having autism. You have a one-to-one aid with you in whatever context you're in to help redirect you at opportune moments. But that's not an extra burden. In fact, in the general education classroom, unlike with Daniel R.R., there's absolutely no evidence of any burden at all. In Daniel R.R., there was a hapless pre-kindergarten teacher who had nobody helping her modify the materials at all. She was doing 90 to 100 percent of the modification herself. She was getting distracted from any of the other class members. She couldn't do anything but work with Daniel R.R. This is a completely different circumstance. It is undisputed that the staff members at CCISD collectively had to modify the materials to a lower level that he needed increased repetition and that he needed, that it was at a reduced level of work. But that doesn't mean modifying beyond recognition. And as this court focused in Daniel R.R. and in the Brillen case, the point is, what is the burden on the school district? Is the school district having to go through all of these contortions to try to design this program in a way that will fit this child? Where does the burden on the school district fall in the Daniel R.R. factors? Since you're trying to apply these multi-factor tests and we're talking about what's the burden on the school district and you say it's nonexistent or minimal, where do we put that? What box do we put that in in terms of Daniel R.R.? I think it's the factor, what I count as factor number two, because the factors that I see in Daniel R.R. are, has the school district accommodated, has the school district been forced to modify the basic curriculum to such a degree that will take an enormous amount of time and effort to do it? Are there academic benefits to the child from being in the general education classroom? Are there non-academic benefits to being in the general education classroom? And are there harmful effects on the classroom, on the general classroom? And so I put that in number two. And I think the district is focused on this as sort of in the abstract that, well, yeah, you have to modify the curriculum for AB. There's no question that you have to modify the curriculum for AB. But is there any burden on the school district to do that? None. Because as the teachers, when you look at the record sites that the school district just pointed to, when these school district staff members are testifying about what is happening with AB in their classroom, they're not testifying about any burden to them as general education teachers. What they say is, well, we work with the special education staff, we work with the paraprofessional to modify these materials, and when AB is working on these things within the classroom, he's generally working on them with a paraprofessional. But there's no sense at all that the actual teacher is taking these, is engaging with in an enormous amount of effort. And in fact, if the court looks at record on appeal 1443 to 1477, you see actual materials that AB was working on. And you can see the materials that are from the general education curriculum. It's just that the teacher would lop off a few things, say you don't need to worry about these things over here, spend your time on these things over here. So if they're highly abstract concepts, and the science teacher testified about this. What about the questions I had, is there any evidence of him working with any of the other students? There's evidence of him work, of other students approaching him. Well, no, just any collaborative work at all. I don't think that there's evidence one way or the other. So the math incident, he described it correctly? Yes, I think he described it correctly. That there's evidence from CCISD staff members, there's testimony that the other individuals in the classroom were very kind to him, very outgoing with him, very receptive of him. I don't think there's evidence one way or the other that they sat and did lesson plans with him. But the reality is that that's not a critical factor. It would be critical if it did happen. But the fact that it didn't happen is not so damaging from the perspective of whether or not to keep A.B. in the general education classroom. I didn't hear them emphasize that this was such a burden on them. I really heard them saying this isn't appropriate for him. He's at the kindergarten level, they're at the fourth, so we simply can't educate him at that level, and therefore we aren't obliged to. And it's no burden on him at all. Oh, okay. And so I'm not really hearing them saying it's a burden on him, certainly not disrupting the others, not hurting him. He's around children that wonderfully don't seem to be enhancing of each other. It's simply Texas's school district saying we don't have to do this. We don't have to give a teacher's assistant that is reducing the expectations. Right. And the reality is that they do, because there's nothing in Daniel R.R. The statute clearly indicates that they have to do it. Supplemental services. Right. They have to provide supplemental services, and they have to maximize. What's the best law that helps us understand the phrase that's becoming so important here, beyond recognition? So you think it's the Sixth Circuit case you pointed us to? In other words, when does a child end up learning material that's beyond recognition? So the beyond recognition is not a term in the statute. I know that. Beyond recognition is a term in Daniel R.R. And so the Sixth Circuit case, I think, is absolutely on all fours with this one. I think that in order to find for the school district, this Court would have to just say Fifth Circuit law is completely different from Sixth Circuit law. In terms of a case that really describes what beyond recognition means, I don't think you're going to find one except for Daniel R.R. and Brillum, which doesn't really unpack what the phrase beyond recognition is. Actually, it is correct that he was at a kindergarten level. Do you accept that characterization? Kindergarten to first grade, yes. Yes, Your Honor. He was factually up. But in light of the NREF decision in 2017 in the Supreme Court, it's not required for a student to make progress along the same lines as a typically child. The others, it's based on his idea. Right. Exactly. And this Court has reinforced that same idea in the Houston Independent School District case in 582 F3rd 576. Under the IDA, a child's progress and development is measured with respect to his individual progress, not his abilities in relation to the rest of the class. So that, I think, is the reason. I think this Court even recognized that in Daniel R.R., which is why I think when it was focusing on the beyond recognition idea, the question was not so much taking that student in the abstract and figuring out whether it was appropriate for him to be in general education because of the modifications to the curriculum. This Court in Daniel R.R. was talking about the beyond recognition because of the effect it had on the general education teacher. In other words, she herself, because she had no age, she had no other staff members to work with, it was only her, she was modifying 90% to 100% of the material. But let's change the facts here, then. Let's imagine Texas couldn't have the teacher's aid. Wouldn't that then put the burden on the only teacher? In other words, is the rule you're asking for one that requires them to have the aid? The rule that I'm asking for is one that requires them to have the aid, yes. In other words, if in a different set of circumstances, if the school district had taken him out of second grade and said, wow, he's great, we're going to put him in third grade, and he doesn't even need an aid anymore. And they had propelled him in there. And then he had done really poorly. Then I think, I don't think the question would at that point, in that sort of counterfactual, would have gotten to, well, OK, so now let's put him all the way back into the learning to learn classroom, because the school district doesn't have to provide him with an aid. I think the question would be, well, do they have to provide him with a supplemental service, which they already did in second grade, and which he did really well by their own admission in second grade? Do they have to provide that? So yes, in a completely different fact. If we were back to Daniel R.R., where the school district had not ever made the decision to provide him with a paraprofessional, and the school district just didn't have any paraprofessionals at their disposal, then, and this is what Daniel R.R. specifically says about the rocker decision in the sixth, in the sixth, excuse me, sixth is not an easy word to say without water. This is what the Daniel R.R. decision specifically said in distinguishing the rocker decision in the sixth circuit, which is sort of the precedent on which the L.H. case is based. Now, this court in Daniel R.R. said, the sixth circuit requires a school district to place the child in a regular mainstream setting if it can provide the same special education services that it would in a special education setting. And this court in Daniel R.R. said, we're not going to require that. We're not going to say that the district automatically has to use every tool that it would use in the special education setting to supplement what it's doing in the regular education setting and to provide the child with education in the regular education setting, especially if there are no other advantages that accrue to that child. But that's not what happened here. What happened here is that he always had a paraprofessional. He always was, at least from the second grade forward, he was in the general education classroom. He had the paraprofessional. He was doing well. They moved him to the third grade with the same setup he had before. He would have been doing well if they had implemented an appropriate behavior intervention plan. They didn't. He had problems. They rectified the issue. He was starting to do well. He was starting to get back on track the way he was in the second grade. And then for some reason, they decided to yank him out anyway. Can the district court properly look at post hoc doing well? Once the stay put order comes in place, I take it he did well in the mainstream class. He did well. Is that evidence relevant? Can that evidence been relied on to say, this is working. This is where you ought to be. Let me make sure I understand Your Honor's question correctly. Is the question whether the district court should properly have cut off the inquiry at the time of the initial ---- Yeah. I'm thinking if the issue before us is the school district's placement decision, can one nonetheless test that by subsequent stay put, good job in mainstream evidence? Yes. You would say yes, but we don't have to reach you. In fact, I say yes not because I have a particular case in mind, but because even after a due process hearing is implemented, a district court can always look at new evidence. There are mechanisms to allow a district court to look at new evidence that would allow the district court to get to the correct decision. I think it's appropriate for the district court to look at that evidence. In this case, I think that there's another procedural reason why that's true as well, and that is that the due process complaint itself was on hold. Your light's on. You're just so focused, you're not ---- I'm never used to myself. But I think we've got the argument. Thank you very much. Thank you, Your Honor. May it please the Court. I think opposing counsel's presentation was fairly illuminating on the distinction between the law in this circuit and the law he's asking to apply. In Daniel R.R., the Fifth ---- this circuit expressly rejected the Sixth Circuit's Ronker test, going so far as to circulate the opinion to the en banc court before issuing it because it expressly initiates a conflict with the Sixth Circuit. The Sixth Circuit case, A.B. cited, is predicated on Ronker. It is a different body of law. There is a conflict between the circuits. Returning to the ---- Articulate for me what exactly is the conflict, and how does it help your case? Ronker applies a feasibility test, and that's essentially what A.B. is asking. So, yes, it's critical. Under Ronker, if it's feasible, if it's possible to create a classroom within a classroom, the school district has to do it. Under this circuit, feasibility's not the test. Everything A.B. argued to you was a feasibility argument. If you look at what this court wrote in Daniel R.R., and the focus by A.B. was on the first part of this sentence, but there's a very important or. This court said the act does not require regular education instructors to devote all or most of their time to one handicapped child or to modify the regular education program beyond recognition. No, the response to that was, in Daniel R.R., that's a reference to modifying the curriculum for everyone. Is that a distinction here? I don't think it's modifying the curriculum for everyone. I think it's modifying the curriculum for the special education student. Doesn't special education, they always have to have a modified curriculum. That's right. They're always going to have a modified curriculum, but not beyond recognition. This is where we get to the beyond recognition. So a supplementary aid or service could involve more time. It could involve changes to the assignments. But it can't involve. It becomes beyond recognition when it's modified down two grade levels to a grade level and a half. That's when third grade. That seems to undo the entire purpose. The whole purpose is these are challenged students. It's really wonderful for them and their regular peers to be together. Once we say, well, not if we modify it, but by nature they need modification, that would allow schools to just say, well, take the federal money, but we won't give the supplemental services because they need a modification. Well, and so I think that's the real crux of the matter. That's not your position. It's not my position. The modification is modification beyond recognition. So it is a question of degree. It is. It is a question of degree. And isn't that a fact finding? Yes, it would be a fact finding. But here the facts are undisputed that it was modified down to a different grade level. The hearing officer made that finding. All the evidence comes to that finding and supports that finding. The district court doesn't even really quibble with that finding. The district court really relied mistakenly on the fact that he needed or that he could access his peers in the general education curriculum. This court in Daniel R.R. focused on modified beyond recognition, which is what we have here. This case is nearly on four squares with Daniel R.R. and Breland. Was there a teacher's aide in Daniel R.? Was there a teacher's aide in Daniel R.R.? You asked and I just blanked out on that. I don't know. I'm hesitant to say. I thought from his characterization, because I forget too, that our focus was it absorbed the teacher's time or it would disrupt the regular curriculum. I don't remember D.R.R. saying, well, he's fine, he's not disrupting, the teacher's fine with the rest of them. But because he needs help, lots of help, we're going to put him in the other place. So here's that distinction in this Court's language. Those are two possibilities, two problems. Mainstreaming is not appropriate if it would take up all of the teacher's time. Right. So to your question, suppose budgetary constraints precluded a paraprofessional, and here, different from a one-to-one aide, the paraprofessional became the teacher. But I'm not sure that's been decided in the law. Because you're getting money to give those. So a school can't say, well, we don't have the money. That means they get the Federal money, but then they can use it for other things. That's not the argument. Okay. So the argument is just, was his curriculum modified too far? I think that's a fairly fair summation, Your Honor, is was the curriculum modified beyond recognition? And if it was, and here, all of the evidence and the factual findings support the conclusion that it was modified beyond recognition. It was no longer a third-grade curriculum. Then this Court has held that mainstreaming is not appropriate. The only benefit would be that the student would be sitting in a regular education classroom while getting some other curriculum. That's not what the law requires. That's not what this Circuit's authority requires. For that reason, we'd request that you reverse and render. Thank you. Thank you. Thank you very much.